# EXHIBIT 1

**SINGLETON SCHREIBER, LLP**
PAUL STARITA (7624)
JULIA BRYANT (11594)
Wells Street Professional Center
2145 Wells Street, Unit 302
Wailuku, HI 96798
Telephone: (808) 707-7117

591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 771-3473
E-mail: pstarita@singletonschreiber.com
E-mail: jbryant@singletonschreiber.com

**Electronically Filed
SECOND CIRCUIT
2CCV-23-0000234
22-AUG-2023
03:39 PM
Dkt. 1 CMP**

## IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| GILBERTO SANCHEZ, Individually and on Behalf of All Persons Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> HAWAIIAN ELECTRIC INDUSTRIES, INC., a Hawaii corporation; HAWAIIAN ELECTRIC COMPANY, INC., a Hawaii corporation, HAWAI'I ELECTRIC LIGHT COMPANY, INC., a Hawaii Corporation; MAUI ELECTRIC COMPANY, LIMITED, a Hawaii corporation; and DOES 1–200, inclusive, <br><br> Defendants. | Civil Case No. (Other Non-Vehicle Tort) <br><br> **CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS** <br><br><br> Damages Exceed $150,000 |

## CLASS ACTION COMPLAINT

1.     Plaintiff Gilberto Sanchez ("Plaintiff"), on behalf of himself and all persons similarly situated, and by and through Plaintiff's undersigned counsel, hereby submits this Complaint and jury demand against Defendants Hawaiian Electric Industries Inc.; Hawaiian Electric Company Inc.; Hawai'i Electric Light Company Inc.; Maui Electric Company Limited;

1

and Does 1 through 200, inclusive (collectively "Defendants"). Upon information and belief and based upon the investigation of counsel, Plaintiff states and alleges the following:

## **<u>INTRODUCTION</u>**

2.     This is a class action for damages brought by all persons who at all relevant times, owned or rented property, or otherwise resided in the County of Maui, in the State of Hawai'i for damages they have suffered, and continue to suffer, due to exposure to toxic air, soil, and water pollutants as a result of the Lahaina Fire – America's deadliest wildfire in more than a century.

3.     The Lahaina Fire (the "Fire") ignited on August 8, 2023 in West Maui as a result of Defendants' failure to properly design, construct, operate, manage, maintain, monitor and/or repair its electrical infrastructure

4.     That day, residents of Maui County experienced horrors beyond their greatest imagination.

5.     In a matter of hours, the historic town of Lahaina, the former capitol of the Hawaiian Kingdom, was obliterated to ash and rubble by the fast-moving Fire that was accelerated by foreseeable and forecasted winds.

6.     The Fire ravaged through the streets, indiscriminately destroying anyone and anything in its path.

7.     Hundreds of people were engulfed by flames and thousands were forced to flee. Homes, businesses, churches, schools, and cultural sites were burned to the ground.



Photograph from: https://www.nbcnews.com/news/us-news/coast-guard-rescued-14-took-shelter-ocean-maui-wildfire-rcna99163



Photograph from: https://abcnews.go.com/US/maui-wildfire-survivor-recounts-harrowing-experience-hiding-beach/story?id=102258148



Photograph from: https://www.latimes.com/california/story/2023-08-10/smoking-devastation-of-maui-wildfires-is-clear-in-before-and-after-satellite-images

8.    As the Fire raged, thick plumes of smoke, debris, and toxins filled the air above it and quickly spread throughout Maui County—cloaking residents and surrounding lands in toxic chemicals and hazardous air pollutants. These toxins also seeped into the soil and contaminated water supplies.

9.    The smoke from the Lahaina Fire ("Smoke") contained ash and dust consisting of toxic chemicals and volatile organic compounds—large groups of chemicals that increase the likelihood of cancers, cognitive impairments, and birth defects—from burned buildings, gas stations, vehicles, boats, pipes, propane tanks, plastics, rubber, dyes, detergents, paint, lead, metals, and various other materials. These toxic chemicals include but are not limited to: particulate matter ("PM"), asbestos, lead, benzene, arsenic, carbon monoxide, carbon dioxide, nitrogen oxides,

volatile organic compounds, and polycyclic aromatic hydrocarbons ("Air Pollutants").[1,2]



Photograph from: https://www.modbee.com/news/local/article278146917.html



Photograph from: https://nypost.com/2023/08/15/chemicals-from-maui-wildfires-pose-long-term-risk-officials/

[1] A Maui resident stated to news reporters that she was told from local air quality officials that they cannot expect to be back in their homes any time soon, as the air is still dangerously contaminated. The official stated to the resident that "[t]he air quality coming from Front Street with the winds is ***deeply toxic with asbestos***." (emphasis added) **Source**: https://www.washingtonpost.com/climate-environment/2023/08/17/maui-fires-pollution-water-soil/

[2] Hawai'i's health officials and State toxicologist, Diane Felton, reported that the ash and dust from the thousands of burned buildings may contain harmful chemicals like lead and asbestos — and the fires may have even disturbed arsenic once used in herbicides.
**Source**: https://www.nbcnews.com/health/health-news/maui-fires-chemicals-air-water-health-risks-rcna99843

10.     When inhaled, ingested through water, or contacted with skin, these Air Pollutants can enter the lungs and the bloodstream. These Air Pollutants are also known to cause a number of serious health complications, including but not limited to: blood cancer, lung cancer, bladder cancer, breast cancer, stomach cancer, pancreatic cancer, brain cancer, thyroid cancer, childhood cancers, heart disease, lung disease, increased morbidity, including respiratory infections, asthma, bronchitis, emphysema, and chronic obstructive pulmonary disease.

11.     As a result of these pollutants, the County of Maui advised residents in Lahaina and Upper Kula not to use, drink or boil their water because it, too, may contain benzene and other volatile organic compounds. The reason for the possible water contamination, according to Maui County, is that some water systems lost water pressure because of the fire, which can allow contaminants to enter the supply.[3]

12.     These hazardous Air Pollutants, moreover, prompted the Hawai'i State Department of Health (DOH) to broadcast a warning to anyone present at or near vicinity of the Fire, to wear protective face masks (specifically a "tight-fitting respirator masks" such as N95 masks), goggles, long sleeves, pants, socks and closed toed-shoes (to avoid skin contact with ash).[4]

13.     Likewise, the Hawai'i State DOH advised residents of Maui County, especially those suffering from pre-existing respiratory conditions such as asthma, bronchitis and emphysema, to take precautionary measures or leave the area until the fire is contained, and the smoke has subsided.[5]

14.     The Air Pollutants from the Lahaina Fire has and will continue to plague the residents of Maui County for the following months and years to come. As a result, Plaintiff and all Class Members have been adversely affected by the acts and/or omissions of Defendants that

---

[3] Aria Bendix, Lauren Dunn and Patrick Martin, *Chemicals released into air and water from Maui fires could pose long-term risk*, NBC NEWS, (Aug. 14, 2023), https://www.nbcnews.com/health/health-news/maui-fires-chemicals-air-water-health-risks-rcna99843.
[4] *DOH ADVISES CAUTION FOR RESIDENTS RETURNING TO WEST MAUI AREA*, STATE OF HAWAII, DEPARTMENT OF HEALTH (Aug. 11, 2023), https://health.hawaii.gov/news/newsroom/doh-advises-caution-for-residents-returning-to-west-maui-area/.
[5] *DOH issues warning regarding smoke, ash from wildfires*, SPECTRUM NEWS, (Aug. 10, 2023), https://spectrum localnews.com/hi/hawaii/top-stories/2023/08/10/doh-issues-warning-regarding-smoke--ash-from-wildfires.

caused the Fire.

15.    Consequently, Plaintiffs and all Class Members reasonably require present and future medical monitoring to ensure early detection of any and all cancers, diseases, or illnesses caused from exposure to Air Pollutants. It is well-known that many of these serious conditions can be asymptomatic in the patient prior to the manifestation of significant and sometimes fatal injuries.

16.    Each and every Plaintiff and Class Member will be better off knowing the physical side effects from their exposure to Air Pollutants from the Lahaina Fire. Therefore, Plaintiffs' and Class Members' damages include the costs of present and future medical monitoring. The notice and diagnostic plan outlined below will equip Plaintiffs, Class Members and their doctors with the requisite knowledge required to take appropriate steps to protect themselves from future harm.



Photograph from: https://www.economist.com/united-states/2023/08/17/lessons-from-the-blaze-that-levelled-lahaina

## PARTIES

### A. PLAINTIFFS

17.    Plaintiffs are individuals and who, at all times relevant to this action, owned or rented property, or otherwise resided in the County of Maui, Hawai'i during or after the Lahaina

Fire, and were exposed to Air Pollutants during or following the Lahaina Fire, and/or subsequent remediation.

18.    Gilberto Sanchez, at all times relevant to this action, was and is a resident of the County of Maui, Hawai'i. Plaintiff Gilberto Sanchez was exposed to Air Pollutants as a result of the Lahaina Fire.

### B.  DEFENDANTS

19.    Defendant Hawaiian Electric Industries, Inc., is a for-profit, investor-owned utility company and, at all times relevant to this pleading, was a Hawai'i corporation authorized to do, and doing business, in Hawai'i, with its headquarters in Honolulu, Hawai'i. At all relevant times to this pleading, Hawaiian Electric Industries, Inc. provided a utility, including electrical services, to members of the public in Hawai'i, including those in Maui County through its subsidiaries, including Hawai'i Electric Light Company, Inc., and Maui Electric Company, Limited. It is the largest supplier of electricity in the state of Hawai'i. It does regular, sustained business throughout Hawai'i, including in Maui County. Its principal place of business is in Honolulu at 1001 Bishop Street, Suite 2900, Honolulu, HI 96813.

20.    Defendant Hawaiian Electric Company, Inc., is a for-profit, investor-owned utility company and, at all times relevant to this pleading, was a Hawai'i corporation authorized to do, and doing business, in Hawai'i, with its headquarters in Honolulu, Hawai'i. At all relevant times to this pleading, Hawaiian Electric Company, Inc. provided a utility, including electrical services, to members of the public in Hawai'i, including those in Maui County. It is the largest supplier of electricity in the state of Hawai'i. It does regular, sustained business throughout Hawai'i, including in Maui County. Its principal place of business is in Honolulu at 820 Ward Avenue, Honolulu, HI 96814.

21.    Defendant Hawai'i Electric Light Company, Inc., is, and at all times relevant to this pleading, a Hawai'i corporation authorized to do, and doing business, in Hawai'i, with its headquarters in Hilo, Hawai'i. At all times relevant to this pleading, Hawai'i Electric Light Company, Inc. acted to provide a utility, including electrical services, to members of the public in

Hawai'i, including those in Maui County. It does regular, sustained business throughout Hawai'i, including in Maui County. Its principal place of business is in 54 Halekauila St Hilo, HI, 96720. Hawai'i Electric Light Company, Inc. is a subsidiary or other entity wholly controlled by Hawaiian Electric Industries, Inc., the largest supplier of electricity in the state of Hawai'i.

22.     Defendant Maui Electric Company, Limited is, and at all times relevant to this pleading, a Hawai'i corporation authorized to do, and doing business, in Hawai'i, with its headquarters in Maui, Hawai'i. Its principal place of business is in Maui County at 210 Kamehameha Avenue, Kahului, Maui, HI. At all times relevant to this pleading, Maui Electric Company, Limited acted to provide a utility, including electrical services, to members of the public in Hawai'i, including those in Maui County. Maui Electric Company, Limited is a subsidiary or other entity wholly controlled by Hawaiian Electric Industries, Inc., the largest supplier of electricity in the state of Hawai'i.

23.     "Defendants" refer collectively to Hawaiian Electric Industries, Inc., Hawaiian Electric Company, Inc., Hawai'i Electric Light Company, Inc., and Maui Electric Company, Limited. Defendants supply electricity in Hawai'i. They own, design, construct, operate, maintain, and repair powerlines and other equipment to transmit electricity to residents, businesses, schools, and industries in Hawai'i, including in and around the ignition point for the Lahaina Fire.

24.     The true names and capacities of defendants DOES 1 through 200 are currently unknown to Plaintiffs who, therefore, sue these defendants under these fictitious names pursuant to Hawai'i Rules of Civil Procedure, Rule 17. These defendants are each directly and/or vicariously responsible, in some manner, for the harms alleged herein. Plaintiffs are investigating the facts leading up to the Lahaina fires. If and when Plaintiffs learn these defendants' true names and capacities, Plaintiffs will seek leave to amend this pleading accordingly.

25.     Defendants are jointly and severally liable for each other's conduct pursuant to Hawai'i Revised Statutes section 663-10.9. Hawai'i Electric Light Company, Inc., and Maui Electric Company, Limited are wholly owned, and entirely controlled, by Hawaiian Electric Industries, Inc. Defendants' officers and management are intertwined. Therefore, Defendants are

9

the agents, servants, employees, partners, aiders and abettors, co-conspirators, and joint venturers of each other.

26.    No assignment or transfer of the claim, or of any part thereof or interest therein, has been made.

## JURISDICTION

27.    All incidents described herein occurred in Hawai'i, within the jurisdiction of this Court, and the amount in controversy meets or exceeds the jurisdictional limit of this Court.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

28.    In the days leading up to August 8, 2023, the National Weather Service issued High Wind and Fire Warning, repeatedly warning that these conditions would create the perfect environment for wildfires.

29.    On Friday, August 4, 2023, the National Weather Service in Honolulu (the "Service") advised that Hawai'i could experience "indirect impacts" from Hurricane Dora from Monday, August 7, 2023 through Wednesday, August 9, 2023, including "Strong and gusty trade winds" and "Dry weather & high fire danger."

30.    In its Tweet on Sunday, August 6, 2023, the Service warned that significant differences in atmospheric pressure between Hurricane Dora and the air north of Hawai'i formed a pressure gradient over the islands which, when combined with dry conditions, posed a serious threat of fires as well as damaging winds.



31.     Also on August 6, 2023, the Service posted an update on Hurricane Dora on X, which included the following warning: "While Hurricane Dora passes well south with no direct impacts here, the strong pressure gradient between it & the high pressure to the north creates a threat of damaging winds & fire weather (due to ongoing dry conditions) from early Mon to Wed."[6]

32.     On Monday, August 7, 2023, at 4:42 a.m., the Service issued red flag warnings due to months of drought, low humidity and high winds. The Service predicted high gusts of wind up to 60 miles per hour.

33.     Maui fire officials also warned in an alert issued August 8, 2023, that "erratic wind, challenging terrain, steep slopes and dropping humidity, the direction and the location of the fire



conditions make it difficult to predict path and speed of a wildfire."

34.     Accordingly, prior to and on August 8, 2023, Defendants—which provide service to 95 percent of the state's residents—knew about the extreme threat of fires in Maui. However, despite these warnings, Defendants did not conduct a public power shut-off or de-energize their

---

[6] NWSHONOLULU, (Aug. 6, 2013), https://twitter.com/NWSHonolulu/status/1688339741685792768.

powerlines, despite having knowledge that these are proven methods to prevent wildfires.

35. On August 8, 2023, the strong dry winds from Hurricane Dora came as expected after months of drought. The winds predictably led to trees crashing into Defendants' powerlines, which toppled, igniting surrounding vegetation in communities across Maui, including Lahaina. Over 30 utility poles, some of which were energized, fell onto trees and roads, complicating evacuations.

36. Predictably, the resulting wildfire turned deadly as it destroyed the historic town of Lahaina—the former capital of the Hawaiian kingdom—and spread throughout other areas of Maui, burning over 11,000 acres and catastrophically impacting local communities. Over 2,700 structures have been damaged or destroyed.

37. To date, at least 114 people lost their lives and 850 people have been reported missing, although these numbers are expected rise as crews search scorched areas for survivors and those who lost their lives. The survivors of the Lahaina Fire have reported to suffer from significant personal injuries, including, but not limited to, burns and severe smoke inhalation. Furthermore, the priceless possessions of residents have been incinerated, and their beloved pets and other animals have suffered horrific injuries or deaths. For others, items that residents have spent a lifetime earning, gathering, saving, and cherishing have been reduced to ashes by the Fire.

38. The community and people of Lahaina have also suffered significant environmental and historical loss and impact, including smoke and ash resulting in air quality pollution and damage to significant monumental trees, plants, historical buildings. Lahaina was home to a 150-year-old Lahaina banyan tree, which once stood 60 feet high and a quarter of a mile in circumference and believed amongst conservation experts to be the largest tree of its kind in the United States. However, this banyan tree has also been scorched by the Fire.

39. All of the losses sustained by the local community were a direct result of Defendants' refusal to de-energize their powerlines, maintain vegetation, and their infrastructure. Specifically, Defendants' failure to conduct a public power shut-off or de-energize their lines is and was indefensible due to: (a) the nature and condition of Defendants' utility infrastructure,

which was intended, designed, and constructed to pass electricity through exposed powerlines in vegetated areas; (b) Defendants' aging infrastructure and deferred maintenance; (c) Defendants' failure to maintain the proper tension in their lines to prevent sagging, which is proven to lead to fires, despite years of complaints and warning from Maui residents; (d) Defendants' failure to implement proper vegetation management programs to protect their lines against trees crashing into them during high winds; and (e) Defendants' prior knowledge that deenergizing its powerlines is the most effective safety measure to prevent wildfires.

### A. Defendants have a duty to safely maintain and operate their electric utility infrastructures.

40.    Defendants supply electricity throughout Hawai'i and in the County of Maui. They own, operate, maintain, and repair electric utility infrastructures that transmit electricity to residents, businesses, schools, and industries in Hawai'i, including in and around Lahaina.

41.    Operating high-voltage electric equipment as part of an electric utility infrastructure carries inherent dangers. The inherent and heightened danger associated with the transmission and distribution of electricity through overhead powerlines in vegetated areas requires Defendants to exercise an increased level of care to protect the public and the communities in which their electric utility infrastructures operate. Moreover, Defendants have a level of expertise about the operation of an electric utility infrastructure far beyond that of a layperson and, as such, owe a heightened duty commensurate with this expertise.

42.    Defendants have a duty to adequately operate, monitor, maintain, and repair their electric utility infrastructures to ensure that they do not cause fires. This duty includes deenergizing their powerlines during periods of critical fire risk to prevent fires and to allow first responders to safely access ignited areas to put out fires. Defendants' duty also includes maintaining the land and vegetation around their infrastructure and equipment to ensure that vegetation, objects, and structures will not come into contact with their electric utility infrastructure.

### B. Defendants designed, constructed, used and maintained their utility infrastructure in a manner that would allow a fire to ignite.

43.    Defendants designed their powerlines to transport electricity to its substations and

from the substations to the public directly into their homes. The powerlines' circuitry and conductors were electrically a single and unified circuit that transmitted electricity.

44.    Defendants designed, constructed, used, and maintained their utility infrastructure's system protection devices (which are used to respond to an overcurrent event) in a manner that would keep their powerlines energized for too long after a transmission line failure, allowing a fire to ignite. Defendants could have designed the system protection devices to shut off faster, but failed to do so because tripping the circuit costs time and money. Defendants' decision was a cost-saving one that allowed older, slower equipment to remain in place.

45.    Defendants designed their powerlines to be uninsulated, bare, and/or uncovered conduit carrying high voltage electricity that posed an increased risk of igniting should they come into contact with vegetation or other electrical equipment. Defendants could have designed their powerlines to be insulated and covered, and therefore less likely to ignite vegetation, but failed to do so.

46.    Defendants constructed their powerlines such that they traveled above ground using wooden poles, and left dry, overgrown vegetation below them. Defendants could have constructed their powerlines to travel underground, a request residents and energy experts have made many times, but Defendants ignored. Defendants also could have removed nearby vegetation entirely, but failed to do so.

47.    Defendants designed and constructed their powerlines so that they would reenergize too soon after being de-energized. Defendants could have designed and constructed their powerlines with reclosers that operated more safely, but failed to do so.

48.    Defendants had a responsibility to maintain and continuously upkeep their utility infrastructure, including their powerlines, and to implement vegetation management programs and protocols to ensure the safe delivery of electricity to the public. They failed to do so and allowed their infrastructure to age and deteriorate. Some residents have been battling with Defendants for at least 10 years over the condition of the infrastructure. Long before the fire, several residents

emailed Defendants and provided videos of low hanging lines in trees.[7]

**C. Defendants knew about the extreme fire risks and what to do to prevent wildfires during extreme weather conditions.**

49.     In 2014, the Hawai'i Wildfire Management Organization issued a 2014 wildfire mitigation plan, which warned that warned Lahaina was among Maui's most fire-prone areas based on its proximity to grasslands, steep terrain, and frequent winds and outlined a plan for working with utilities to help reduce the risk of fires.

50.     When a fire broke out in 2020, in O'ahu, the Honolulu Fire Department attributed the fire to powerlines from a different utility company failed in Hurricane Lane's high winds evidencing fires started by utility poles is a real threat.

51.     The 2020 Maui County Hazard Mitigation Plan Update depicts Lahaina and all Lahaina buildings as occupying a "High" Wildfire Risk Area.

52.     Thus, Defendants knew that utility infrastructure could cause fires and that Lahaina was in a high wildfire risk area. Defendants also knew that deenergizing powerlines is an effective way to prevent wildfires during periods of elevated fire danger, including during high wind events. Electric utilities have long used intentional temporary outages to prevent fires. In California, Oregon, Nevada and other states, downed powerlines, sparks from transmission hubs, and other electrical-grid failures have started or spread some of the deadliest and most destructive blazes in U.S. history. That has prompted these states proactively to shut down power to communities when red-flag conditions arise. Defendants recognized that a power shut-off plan could be effective, especially after it reviewed what happened with California's 2018 Camp Fire, which killed 85 people. Last year, Defendants pointed to California's Public Power Shutoff Plan as a successful way to prevent wildfires when additional robust techniques are not yet in place.

53.     Yet, when fire potential in and near Maui County was well above normal levels on August 6, and August 7, 2023, due in part to extreme drought conditions, dry brush, and high winds caused by Hurricane Dora passing on the South, Defendants kept their powerlines active.

---

[7] *Power lines likely caused Maui's first reported fire, video and data show*, THE WASHINGTON POST (Aug. 16, 2023), https://www.washingtonpost.com/climate-environment/2023/08/15/maui-fires-power-line-cause/.

54.     Starting on Friday, August 4, 2023, the National Weather Service (the "Service") began issuing warnings about dangerous weather conditions and high winds for fires in Hawai'i. The Service advised winds of 25 to 45 miles per hour with localized gusts of more than 60 mph were expected for Maui, Molokai, Lanai, Oahu, Hawai'i island and portions of Kauai. The Service and media warned that damaging winds could blow down trees and powerlines. The Service issued a fire watch for the leeward portions across the state starting this morning though late Tuesday night due to the high winds and humidity being 40 to 45 percent during the afternoons and evening. The Service advised any fires that develop will likely spread rapidly.

55.     On Monday, August 7, 2023, at 4:42 a.m., the Service issued a "Red Flag Warning" that continued until August 10, 2023 at 6:00 a.m. and predicted extreme winds and fire dangers. The Service issues a "Red Flag warning" when "warm temperatures, very low humidities, and stronger winds are expected to combine to produce an increased risk of fire danger."[8]

56.     On August 8, 2023, the Governor of Hawai'i issued a proclamation relating to wildfires. The Governor stated that very dry conditions and strong and potentially damaging easterly winds caused by the passage of Hurricane Dora to the south of the State are contributing to the wildfire danger. The Governor directed the Director of Hawai'i Emergency Management and the Administrator of Emergency Management to take appropriate actions to direct or control, as may be necessary for emergency management, including issuing alerts, warning, notifications and activations, issue warnings and signals for alerts and any type or warning device, system, or method to be used in connection therewith, shut off water mains, gas mains, electric power connections, or suspension of other services, and issue mandatory evacuations.

57.     Maui Fire officials warned in an alert issued August 8, 2023, that "erratic wind, challenging terrain, steep slopes and dropping humidity, the direction and the location of the fire conditions make it difficult to predict path and speed of a wildfire."

58.     Defendants' own monitoring system provided advance notice of issues with its

---

[8] *Red Flag Warning*, NATIONAL WEATHER SERVICE, (Aug. 11, 2023), https://www.weather.gov/mqt/redflagtips.

powerlines to Defendants allowing ample time to shut down power. On the night of August 7, 2023 and into the early morning hours, Defendants' data showed powerlines began losing voltage, which can happen when vegetation interferes with wires, lines touch power poles or electrical equipment malfunctions. Defendants had almost 1,000 sensors in Hawai'i and about 70 on Maui. A major fault was felt by all sensors on the island but was strongest near Lahaina.[9]

**D. Defendants' actions predictably and inevitably led to a fire igniting on August 8, 2023.**

59.     Before August 8, 2023, Defendants knew that there was an extreme fire risk in and near Maui County. They also knew that wildfires are on average ten times larger than other types of fires. Despite this, Defendants left their powerlines energized when the winds hit exactly as predicted. Defendants failed to de-energize their powerlines despite the National Weather Service's warnings, and despite all the other information Defendants knew about the elevated risk of fire on that day.

60.     Defendants' failure to de-energize their lines on August 8, 2023, was even more egregious in light of their prior acknowledgement and the condition of their utility infrastructure. Defendants knew that (a) their utility infrastructure was intended, designed, and constructed to pass electricity through wooden poles and exposed powerlines in vegetated areas; (b) their aging utility infrastructure was intended, designed, and constructed with poorly designed system protection devices that reboot too quickly; (c) they had a history of improperly maintaining the line tension in their powerlines; (d) they failed to properly, safely, and prudently maintain the vegetation and land surrounding their electrical infrastructure and equipment; and (e) they knew the surrounding vegetation was dry due to the severe drought.

61.     When the high winds, with gusts reaching up to 60 miles per hour, came as predicted, the natural and ordinary consequences of Defendants' choices led to their powerlines falling and starting a brush fire on August 8, 2023, at 6:37 a.m. in the area of Lahainaluna Road.

---

[9] Peter Eavis, Ivan Penn and Thomas Fuller, *Experts Scrutinize Hawaiian Electric as They Search for the Maui Wildfire Cause*, THE NEW YORK TIMES, (Aug. 15, 2023), https://www.nytimes.com/2023/08/14/us/hawaiian-electric-maui-wildfire.html#:~:text=Devastation%20in%20Lahaina-,Experts%20Scrutinize%20Hawaiian%20Electric%20as%20They%20Search%20for%20the%20Maui,lines%20fell%20in%20the%20windstorm..

Given the predicted conditions (including wind speed and direction, topography, and the manner in which wildfires spread), the inevitable consequence of the ignited fires was the creation of a wildfire that spread to Plaintiffs' homes, properties and throughout Maui County completely destroying Lahaina.



Photograph from: https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/



62.    The Lahaina Fire occurred because Defendants: (a) failed to de-energize their powerlines on August 8, 2023; (b) intended, designed and constructed their utility infrastructure to pass electricity through exposed powerlines in dry, vegetated areas; (c) failed to prudently inspect, maintain, and operate the electrical equipment in their utility infrastructure; and (d) failed to maintain the appropriate clearance area between its electrical equipment and surrounding vegetation.

63.    The conditions and circumstances surrounding the ignition of the Lahaina Fire—including the nature and condition of Defendants' electrical infrastructure, low humidity, strong winds, and tinder-like dry vegetation—were forecasted and foreseeable by any reasonably prudent person. Such conditions and circumstances were therefore foreseeable to Defendants, who have special knowledge and expertise as electrical services providers.

**E.  Defendants' actions predictably led to Plaintiffs' harm.**

64.    Defendants knew that any fire that started on August 8, 2023, in Maui County would be almost impossible to contain due to the high winds, dry conditions, high fuel loads, topography, high energy release conditions, limited escape routes, and limited access for firefighters and emergency personnel.

65.    The inevitable consequence of Defendants' intentional decisions, the Lahaina Fire caused over 100 deaths, and impacted many people in the area, causing them to suffer serious, ongoing personal injuries. Maui County Mayor Richard T. Bissen Jr. stated that the death toll so far reflects only those who were found outside of buildings. A number of people were believed to have died in their vehicles attempting to flee from flames at their doorstep without warning.

66.    The health impacts of wildfire smoke and Air Pollutants are on the same order of magnitude, or possibly even greater, than firefighting costs and property damage. This is in part because one of the main components of wildfire smoke are so-called PM2.5 particles, which are up to 10 times more harmful to humans than particles released from other sources, such as car exhaust. PM2.5 particles can pass through the nose and lungs, bypassing the body's defense mechanisms, and enter the bloodstream. From there they can harm the heart, lungs, and other vital

organs, increasing the risk of stroke, heart attacks, and respiratory problems. People with certain preexisting conditions are particularly vulnerable.

67.     Another inevitable consequence of the fire that Defendants' intentional decisions caused was significant property and environmental harm. Article XI, section 9 of the Hawai'i State Constitution, states: "Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources." Due to the Fire, flames, smoke, embers, ash, odors, gases, and airborne particles came into contact with, were deposited on, damaged, destroyed, and/or otherwise trespassed on Plaintiffs' real and personal property, causing very hazardous and unhealthy conditions, and interfering with Plaintiffs' right to enjoy their properties and the environment. This interference is ongoing, as Plaintiffs face an ongoing risk of harm to themselves and their property from flooding, debris flows, diminished and contaminated drinking water quality, decreased soil productivity, contaminated soil, Air Pollutants, volatile chemical compounds, and increased noxious weed spread—all caused by the Lahaina Fire.

**F.  Toxic Air Pollutants from the Lahaina fire.**

68.     As a result of Defendants' acts and/or omissions that caused the Lahaina Fire, Plaintiffs and all Class Members were adversely affected in that they were exposed to wildfire smoke consisting of dangerous levels of air, water, and soil pollutants.

69.     Wildfire smoke is complex—its physical and chemical composition is determined by the type of fuel (trees, shrubbery, grass, etc.) and combustion conditions. Wildfire smoke is typically composed of various Air Pollutants known to be harmful to human health including particulate matter, carbon monoxide, carbon dioxide, nitrogen oxides, volatile organic compounds, and polycyclic aromatic hydrocarbons, amongst other dangerous Air Pollutants. However, depending on the fuel that wildfire smoke consumes, the types of toxic chemicals and compounds released will vary.

70.     An estimated 86% of Maui's 2,719 structures have been exposed to flames when the fire tore through the island, as homes, businesses, churches, schools and cultural sites were decimated and burnt to their foundations.[10]



Photograph from: https://www.hawaiipublicradio.org/local-news/2023-08-12/health-officials-say-cleanup-of-toxic-materials-in-lahaina-may-take-months

71.     Engulfing and charring a majority of Maui's infrastructure, the Fire has burnt through a vast array of burned buildings, gas stations, vehicles, boats, pipes, propane tanks, plastics, rubber, dyes, detergents, paint, lead, metals, and various other materials, releasing a mixture of toxic chemicals into the air that have also seeped into the ground and water supply. Many of these materials were transferred into other materials and compounds as a result of fire that were never designed or meant for human contact.[11]

---

[10] Julia Conley, *Scientists Warn of Toxic Particle Pollution in Maui Wildfire Smoke*, COMMON DREAMS, (Aug. 14, 2023), https://www.commondreams.org/news/maui-fires.
[11] *Id.*

72.    Of particular concern for health officials is the risk of exposure to asbestos, a very popular substance for building materials in the 1960s and 1970s,[12] lead, found in paint used on older structures), and arsenic, a chemical used in the last century as an herbicide on some sugar and pineapple plantations.[13]

73.    Although the Fire has been 100% contaminated, chemicals like benzene and polycyclic aromatic hydrocarbons are frequently detected in ash following wildfires.[14]  The initial release of such Air Pollutants, however, is just the beginning of the damage that results from a wildfire.

74.    Instead, the toxicity of such Air Pollutants often increases the further they travel from the fire ignition site, as smoke particles will undergo chemical reactions—typically oxidation—which converts particles into highly reactive compounds that have even greater capacity to damage cells and tissue.[15]

75.    The oxidation process can double the toxicity of smoke compounds in the first few hours after they are first emitted and may even quadruple the smoke toxicity over the following days.[16]

76.    Toxic smoke compounds may linger in the atmosphere for days, weeks, or even months depending on the length of the wildfire and the amount it burns.[17]

77.    These often-invisible hazards can travel and extend beyond the burn areas to wherever the smoke plumes have traveled.

78.    Furthermore, while the acute risks of breathing in toxic chemicals decrease once a fire is contained and the smoke has dissipated, the emitted airborne particles in the smoke settle

---

[12] Hillary Andrews, *When can Maui start rebuilding? How toxic debris from deadly fires is slowing recovery*, FOX WEATHER, (Aug. 17, 2023), https://www.foxweather.com/weather-news/maui-rebuild-recovery-toxic-ash-california-wildfires.
[13] Conley, *supra* note 10.
[14] *Id.*
[15] Allison Hirschlag, *The long distance harm to health caused by wildfires*, BBC, (Jun. 7, 2023), https://www.bbc.com/future/article/20200821-how-wildfire-pollution-may-be-harming-your-health.
[16] *Id.*
[17] *Id.*

back as ash and soot, clinging onto a variety of surfaces, and even runoff into water sources.[18]

79.    Accordingly, as survivors return to their homes after the Fire has been smoldered, the particles and Air Pollutants released by the Fire have seeped through various openings—no matter the size—clinging to walls and surfaces, penetrating through fabrics, and entering through air ducts.[19]

80.    As a result, the toxic chemicals and compounds linger in the areas of wildfire smoke exposure (and often also run off into a community's water sources), which results in continuous exposure to these chemicals and compounds over and over for long periods of time.[20]

81.    According to Hawai'i's state toxicologist, Diana Felton, the cleanup of toxic materials resulting from the Lahaina fire will likely take weeks, if not months.[21]

82.    Thus, the negative health effects and risks of smoke inhalation will continue to persist for weeks, if not months, even after the Fire itself has been extinguished and contained.

**Particulate Matter**

83.    Particulate matter ("PM") is one of the leading sources of danger to human health from wildfire smoke. PM is contained in the air we breathe indoors and outdoors; however, the quantity of PM substantially increases during wildfire activity.[22] Unlike other pollutants in wildfire smoke, PM is the only pollutant that is not a gas. Instead, PM particles are microscopic solid- or liquid-state particles that are suspended in the air.

84.    PM is typically composed of a mixture of compounds, usually present as soot or oily substances high in elemental and organic carbon, black carbon, minerals, dissolved gasses,

---

[18] Gabriel Spitzer, *The burn zone on Maui is laden with toxins, officials say,* CAPRADIO, (Aug. 17, 2023). https://www.capradio.org/news/npr/story?storyid=1194466944.

[19] Andrew J. Whelton, *After Maui fires, human health risks linger in the air, water and even surviving buildings*, THE CONVERSATION, (Aug. 12, 2023), https://theconversation.com/after-maui-fires-human-health-risks-linger-in-the-air-water-and-even-surviving-buildings-211404

[20] Spitzer, *supra* note 18.

[21] Savannah Harriman-Pote, *Health officials say cleanup of toxic materials in Lāhainā may take months*, HAWAI'I PUBLIC RADIO, (Aug. 12, 2023), https://www.hawaiipublicradio.org/local-news/2023-08-12/health-officials-say-cleanup-of-toxic-materials-in-lahaina-may-take-months.

[22] *Particulate Matter (PM) Basics*, ENVIRONMENTAL PROTECTION AGENCY, (Jul. 11, 2023), https://www.epa.gov/pm-pollution/particulate-matter-pm-basics.

and/or metallic compounds.[23],[24]

85.     PM air particles are characterized by their diameter and typically grouped into two categories: coarse particles ("PM$_{10}$") and fine particles ("PM$_{2.5}$").

86.     PM$_{10}$ are smaller than or equal to 10 µm and make up a small percentage of particles present in wildfires. PM$_{10}$ particles may be inhaled into the lungs and cause local and systemic inflammation of the respiratory system. Exposure to PM$_{10}$ may cause respiratory diseases such as asthma and bronchitis.[25]

87.     In comparison, PM$_{2.5}$ consists of particles smaller than 2.5 µm and is the main pollutant in wildfire smoke, making up approximately 90% of the total particle mass of wildfire smoke. These particles are of particular concern because they are smaller than the width of human hair, typically 50 to 70 µm, or a particle of beach sand, typically about 90 µm wide.[26]



Photograph from: https://www.epa.gov/wildfire-smoke-course/why-wildfire-smoke-health-concern

[23] Yvonne Boose, *What Is Particulate Matter?*, BREEZOMETER, (Mar. 23, 2022), https://blog.breezometer.com/what-is-particulate-matter.
[24] Chen *et al.*, *Cardiovascular health impacts of wildfire smoke exposure*, BIOMEDCENTRAL (Jan. 7, 2021), https://particleandfibretoxicology.biomedcentral.com/articles/10.1186/s12989-020-00394-8.
[25] Boose, s*upra* note 23.
[26] The National Academic Press *et al.*, *Implications of the California Wildfires for Health, Communities, and Preparedness: Proceedings of a Workshop* (2020), p. 34.

88.    The size of $PM_{2.5}$ makes it almost invisible to the human eye and allows these particles to seep indoors. The size of $PM_{2.5}$ also enables these particles to lodge in the lungs and travel into the bloodstream.

89.    At baseline, $PM_{2.5}$ indoors is equivalent to 25-33% of the $PM_{2.5}$ outdoors.[27] However, a wildfire can abruptly increase ambient levels of $PM_{2.5}$ to more than 2000 μg/m3.[28] Accordingly, studies have shown that wildfire activity may cause indoor $PM_{2.5}$ pollution to increase by 77-78% of that found outdoors during wildfire activity.[29]

90.    Other studies have revealed that $PM_{2.5}$ levels increased to the 90th percentile and correlated with increased levels of ambient carbon monoxide (CO), ozone (O3), and nitric oxide (NO) during wildfires.[30]

91.    Not all $PM_{2.5}$ particles are made equally, as $PM_{2.5}$ emanating wildfires can be up to ten (10) times more harmful than the same type of air pollution coming from combustion activity.[31] Accordingly, prolonged exposure to $PM_{2.5}$ from wildfires results in more adverse effects than everyday $PM_{2.5}$ particles suspended in the air.

92.    For instance, $PM_{2.5}$ from wildfire smoke can affect the cardiovascular system by causing pulmonary and oxidative stress and inflammation, triggering the autonomic nervous system.[32] $PM_{2.5}$ may also enter the bloodstream, where the tiny particles can cause cardiovascular diseases or enter organs beyond the respiratory and cardiovascular systems. This poses a range of long and short-term health threats.

93.    Various studies have shown that long-term exposure to $PM_{2.5}$ may lead to various types of cancer. Long-term exposure to such particles has also been associated with an increased likelihood of developing severe COVID-19 symptoms.[33] Furthermore, long term effects of $PM_{2.5}$

---

[27] Grant *et al.*, *Long-term health effects of wildfire exposure: A scoping review*, SCIENCE DIRECT, (Mar. 2, 2022), https://www.sciencedirect.com/science/article/pii/S2667278221001073?via%3Dihub.
[28] Chen, *supra* note 24.
[29] Grant, *et. al*, supra note 27.
[30] *Id.*
[31] Mary Kekatos, *Toxic smoke from Canadian wildfires could impact health of millions of Americans*, ABC 7, (Jun. 5, 2023), https://abc7.com/canadian-wildfire-health-impacts-americans-toxic-air-quality/13348093.
[32] The National Academic Press *et al.*, s*upra* note 26.
[33] Boose, s*upra* note 23.

may result in cardiac arrhythmias, worsening heart failure, and triggering atherosclerotic/ischemic cardiovascular complications, particularly in certain high-risk subpopulations.[34]

94.     The health effects and risks of $PM_{2.5}$ exposure and inhalation vary by age. Exposure to $PM_{2.5}$ is more dangerous for children and those in middle to old age compared to those in young adulthood. For instance, children under eighteen (18) years of age are considered "sensitive" to wildfire smoke—even if they do not have a pre-existing illness or chronic condition.

95.     For those with pre-existing respiratory issues and cardiovascular disease like asthma or other respiratory diseases, wildfire smoke and exposure to $PM_{2.5}$ may lead to breathing difficulties and exacerbate such symptoms and diseases. Accordingly, inhalation of wildfire smoke may affect developing lungs, result in or exacerbate asthma symptoms and/or trigger asthma attacks, result in increased respiratory symptoms and decreased lung function, and induce symptoms like coughing, wheezing, difficulty breathing, and chest tightness.

96.     Those with cardiovascular disease may be particularly prone to increased risks of heart attacks and sudden death from cardiac arrhythmia, heart failure, or stroke.

97.     Increased levels of Air Pollutants like PM have also been shown to be associated with cardiovascular disease—the leading cause of death worldwide—including ischemic heart disease and stroke.[35]

**Asbestos**

98.     Asbestos is a name given to six minerals that come as bundles of fibers that can be separated into thin, durable threads.[36] Asbestos fibers are flexible and resistant to heat, electricity, and corrosion.[37] Accordingly, asbestos is typically used in commercial and industrial settings.

99.     However, asbestos is a highly hazardous substance. When asbestos is released into the air, tiny fibers are also released. Inhalation of such particles may cause tiny asbestos fibers to

---

[34] Chen, *et al*., supra note 24.
[35] *Id.*
[36] National Cancer Institute, Asbestos Exposure and Cancer Risk, NATIONAL CANCER INSTITUTE, (Nov. 29, 2021), https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/asbestos/asbestos-fact-sheet#what-is-asbestos.
[37] Michelle Whitmer, *Asbestos*, ASBETOS.COM, (Aug. 16, 2023), https://www.asbestos.com/asbestos/.

lodge into the lungs and irritate lung tissues.[38]

100.    Additionally, once burned, asbestos becomes "friable," meaning that it becomes very dangerous to inhale.[39]

101.    Asbestos has been classified as a known human carcinogen,[40] and repeated exposure may result in fatal and serious diseases such as mesothelioma, asbestos-related lung cancer, asbestosis (a condition that may cause progressive shortness of breath that can be fatal), and pleural thickening (the thickening and swelling of the lung's lining).[41]

**Lead**

102.    Lead is a naturally occurring toxic element found in the earth's crust. The widespread use of lead has resulted in human exposure and significant public health issues.[42]

103.    Exposure to lead mainly results from inhalation of lead particles by burning materials which contain lead (e.g. smelting, recycling, stripping lead paint and plastic cables containing lead, and using leaded aviation fuel), and ingestion of lead-contaminated dust through leaded pipes.[43]

104.    Children are particularly susceptible to lead poisoning, as they absorb about four to five times any ingested lead compared to adults.[44]

105.    Lead exposure for children is particularly dangerous, as even low levels of lead in the bloodstream can lead to irreversible brain damage and impede a child's performance in school.[45] Higher levels of lead exposure may result in serious health consequences. For instance, lead exposure to the brain and central nervous system may result in coma, convulsions, and even

---

[38] ATSDR, Health Effects of Asbestos, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, (Nov. 3, 2016), https://www.atsdr.cdc.gov/asbestos/health_effects_asbestos.html.

[39] Andrews, *supra* note 12.

[40] National Cancer Institute, *supra* note 36.

[41] Health and Safety Executive, *Why is asbestos dangerous?*, HEALTH AND SAFETY EXECUTIVE,  https://www.hse.gov.uk/asbestos/dangerous.htm

[42] WHO, *Lead poisoning*, WORLD HEALTH ORGANIZATION, (Aug. 11, 2023), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health

[43] *Id.*

[44] *Id.*

[45] Joshua Partlow, Scott Wilson and Dino Grandoni, *The toxic aftermath of the Maui fires could last for years*, THE WASHINGTON POST, (Aug. 17, 2023), https://www.washingtonpost.com/climate-environment/2023/08/17/maui-fires-pollution-water-soil/

death.[46]

**Benzene**

106.    Benzene is a colorless chemical and may be a light-yellow liquid at room temperature. It has a sweet odor and is highly flammable. Benzene is naturally occurring and widely used in the U.S.[47]

107.    Benzene is often formed through natural processes, such as from volcanoes and forest fires.[48] As one of the twenty most widely used chemicals in the United States, benzene is omnipresent because it is often used to make other chemicals—including plastics, resins, lubricants, rubbers, dyes, detergents, drugs, and pesticides. Benzene is also commonly found in crude oil, gasoline, and cigarette smoke.[49]

108.    Short term effects of benzene may result in drowsiness, dizziness, headaches, tremors, confusion, or unconsciousness. Exposure to benzene vapors may also induce skin, eye, and throat irritation.[50]

109.    Prolonged benzene exposure may cause bone marrow to not produce enough red blood cells (leading to anemia) or cause damage the immune system due to changes in blood levels of antibodies or loss of white blood cells in humans.[51]

**Arsenic**

110.    Arsenic and inorganic arsenic is a confirmed carcinogen and highly toxic. Exposure to arsenic typically occurs through food, water, soil, and air.[52]

111.    Wildfires may stir up arsenic present in soil, as the chemical has historically been used as an herbicide in parts of Hawai'i. Arsenic binds tightly to the dirt, and is likely found in

---

[46] WHO, supra note 42.

[47] CDC, *Facts About Benzene*, CENTERS FOR DISEASE CONTROL AND PREVENTION, (Apr. 4, 2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp#:~:text=The%20Department%20of%20Health%20and,of%20the%20blood%2Dforming%20organs.

[48] ACS, *Benzene and Cancer* Risk, AMERICA CANCER SOCIETY, (Feb. 1, 2023), https://www.cancer.org/cancer/risk-prevention/chemicals/benzene.html

[49] *Id.*

[50] *Id.*

[51] CDC, *supra* note 47.

[52] ATSDR, *What is Arsenic?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, (May 19, 2023), https://www.atsdr.cdc.gov/csem/arsenic/what_arsenic.html

dust and ash.[53]

112.    Arsenic exposure typically occurs through ingestion and inhalation. Major sources of arsenic inhalation may come from the burning of fossil fuels that contains arsenic, pesticide manufacturing facilities, and smelters.[54]

113.    Severe arsenic toxicity, however, may occur through the inhalation of burning material containing arsenic (arsenic is typically used as a wood preservative). Inhalation of smaller particles may result in deposits in the respiratory tract, while particles lodged in the upper airways may result in gastrointestinal tract absorption.[55]

114.    Arsenic exposure has been linked to lung, bladder, skin, kidney, liver, and prostate cancer.[56]

**Carbon Monoxide**

115.    Carbon monoxide (CO) is a colorless, odorless gas that is most present and concentrated during a fire's smoldering stages (typically at the end of a fire). Carbon monoxide particles are also almost invisible to the naked eye.

116.    Carbon monoxide is deadly, even in small amounts. Concentrated exposure to carbon monoxide may result in red blood cell poisoning, cell death, and interference with oxygen update. Furthermore, carbon monoxide exposure has been tied to headaches, reduced alertness, and aggravation of a heart condition known as angina. Exposure has also been tied to the worsening of pre-existing conditions such as asthma and heart disease.

**Carbon Dioxide**

117.    Carbon dioxide ($CO_2$) is a colorless, odorless, non-flammable gas that may be released through the burning of gasoline, coal, oil, and wood. Carbon dioxide acts as a simple asphyxiant, a gas that reduces or displaces the normal oxygen in breathing air.

---

[53] Bendix, *et al.*, supra note 3. 3
[54] ATSDR, *What are the Routes of Exposure for Arsenic?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, (May 19. 2023), https://www.atsdr.cdc.gov/csem/arsenic/what_routes.html#anchor_1592398498.
[55] *Id.*
[56] ACS, *Arsenic and Cancer Risk*, AMERICAN CANCER SOCIETY, (Jun. 1, 2023), https://www.cancer.org/cancer/risk-prevention/chemicals/arsenic.html.

118.    Extreme carbon dioxide concentrations may cause oxygen-depleted air. Extreme exposure to such air may lead to suffocation and death. Exposure to high levels of carbon dioxide may result in rapid breathing, confusion, increased cardiac output, elevated blood pressure, and increased arrhythmias. Mild exposure may cause headaches and drowsiness.

**Nitrogen Oxides**

119.    Nitrogen oxides ($NO_x$) consists of a group of related gases. Nitrogen oxide exposure may result in changes to the pulmonary system, including pulmonary edema, pneumonitis, bronchitis, bronchiolitis, emphysema, and methemoglobinemia. Symptoms like cough, hyperpnea, and dyspnea may also result.

120.    Nitrogen dioxide ($NO_2$), one type of nitrogen oxide, can form when fossil fuels like wood or natural gas are burned in wildfires. Nitrogen dioxide dissolves the airway lining fluid and creates a powerful acid that damages small airways in the lungs and may damage structural and functional lung cells. Nitrogen dioxide can also initiate free radical generation, causing protein oxidation, lipid peroxidation, and cell membrane damage, and reduce resistance to infection by altering macrophage and immune function.

121.    Nitrogen dioxide exposure may also cause increased inflammation of the airways, worsened cough and wheezing, reduced lung function, increased asthma attacks, and a greater likelihood of emergency department and hospital admissions. For children, exposure to nitrogen dioxide has been found to cause asthma.

**Volatile Organic Compounds**

122.    Volatile organic compounds (VOCs) are a class of chemicals that vaporize into air Typically colorless, these compounds may be released through gasoline, burning wood, and/or other fuels.

123.    Because VOCs consists of a class of chemicals, exposure to VOCs has varying health effects. At the most extreme, exposure to VOCs may be hazardous, as some have been proven to be carcinogenic, such as benzene (leukemia), formaldehyde (nose and throat, leukemia), TCE (kidney cancer), chloroform (bladder, intestine, liver and kidney cancer), and naphthalene

(throat cancer).

124.    Low levels of exposure to VOCs may cause eye, nose, and throat irritation, headaches, nosebleeds, fatigue, nausea, and dizziness. Higher exposure may cause liver, kidney, or central nervous system damage, along with possible vision and memory problems.

**Polycyclic Aromatic Hydrocarbons**

125.    Polycyclic aromatic hydrocarbons (PAHs) are a class of chemicals that may be released from the burning of coal, oil, gas, wood, garbage, and tobacco. PAHs can bind to or form small particles in the air.

126.    Scientists consider several of the PAHs to be carcinogenic. Long-term health effects of exposure to PAHs may include cancer, cataracts, kidney and liver damage, and jaundice. Repeated skin contact may result in redness and inflammation the skin, and when exposed to sunlight, skin that has come into contract with PAHs may peel and blister.

**Health Effects on Populations Most at Risk**

127.    Even for otherwise healthy individuals without pre-existing conditions, brief exposure to wildfire smoke can lead to stinging eyes, irritated sinuses, wheezing, shortness of breath, headaches, itchy skin, and coughing.[57]

128.    However, for populations such as children, pregnant woman, the elderly, people with pre-existing lung or heart diseases and respiratory infections, those suffering from COVID-19, and stroke survivors, the adverse health effects of wildfire smoke inhalation are more acute, as these populations are more likely to suffer chronic symptoms.[58]

129.    Children are at risk for exposure to wildfire smoke because they tend to breathe faster, are more active outdoors, and breathe in more air per pound of body weight in comparison to adults. Additionally, their lungs are still developing, meaning that any exposure children have to poor air quality from wildfires may result in negative impacts on their long-term health.[59]

---

[57] Dani Blum, *How Worried Should You Be About Be About Wildfire Smoke Exposure?*, THE NEW YORK TIMES, (Jun. 28, 2023), https://www.nytimes.com/2023/06/08/us/wildfire-smoke-health-risks.html.
[58] CAA, *Wildfire Smoke*, PUGET SOUND CLEAN AIR AGENCY, https://pscleanair.gov/517/Wildfire-Smoke.
[59] Children's Hospital Colorado, *Wildfire Smoke and Kids: Health Effects*, CHILDREN'S HOSPITAL COLORADO, https://www.childrenscolorado.org/conditions-and-advice/parenting/parenting-articles/wildfire-smoke/

130.    Adults older than 60 can be at a higher risk of harmful effects from wildfire smoke due to the frequency of pre-existing respiratory and heart conditions, as well as a decline in natural physiological defense systems.

131.    Individuals with chronic respiratory or cardiovascular disease, such as those living with heart or lung diseases like coronary artery disease, asthma or chronic obstructive pulmonary disease (COPD), are also more likely to be affected when fine particle pollution reaches an unhealthy level.

132.    Pregnant women are more at risk to wildfire exposure, as exposure has been associated with pregnancy loss, low birth weight, birth defects, and preterm delivery. Some studies have also indicated that wildfire exposure may cause cellular damage in first- and second-trimester placentas.[60]

**Health Effects on the General Population**

133.    In the short term, exposure to wildfire smoke has been linked to increased hospitalization and emergency department visits for visits for respiratory symptoms, exacerbation of asthma, and chronic obstructive pulmonary disease (COPD).[61]

134.    Long term health effects from wildfire exposure include eye and respiratory tract irritation, respiratory infection, asthma, COPD, reduced lung function, bronchitis, exacerbation of asthma, heart failure, increased risk of all-cause mortality, premature death, and respiratory morbidity, and cancer.[62, 63]

135.    Globally, wildfire smoke has been estimated to cause over 339,000 premature deaths a year—a number far greater than the deaths caused directly from fires.[64]

## CLASS ACTION ALLEGATIONS

136.    Plaintiff brings this action pursuant to HRCP Rule 23, on behalf of himself and all

---

[60] Nancy Lapid, *What are the health risks from wildfire smoke?*, REUTERS, (Jun. 7, 2023), https://www.reuters.com/world/americas/what-are-health-risks-wildfire-smoke-2023-06-07/.
[61] Chen, *supra* note 24.
[62] EPA, *Particulate Matter (PM) Basics*, ENVIRONMENTAL PROTECTION AGENCY, (Mar. 27, 2023) https://www.epa.gov/air-research/wildland-fire-research-health-effects-research.
[63] Grant, *et al.*, *supra* note 27.
[64] Hirschlag, *supra* note 15.

other persons similarly-situated for the direct, proximate, and foreseeable damages caused by exposure to Air Pollutants emitted from the Lahaina Fire in Maui County, Hawai'i. Plaintiffs seek to certify and maintain this matter as a class action pursuant to HRCP 23(b)(1), (b)(2) and (b)(3) on behalf of a General Class and High Risk Class (collectively the "Class" or "Class Members") as defined below:

> **General Class:** All individuals who owned or rented property, or otherwise resided in the County of Maui, Hawai'i during or after the Lahaina Fire, all of whom have developed, or in the future may develop symptoms requiring medical treatment and/or medical expenses as a result of being exposed to Air Pollutants caused by the Lahaina Fire.

> **High Risk Class**: All individuals who owned or rented property, or otherwise resided in the County of Maui, Hawai'i during or after the Lahaina Fire, who were sixty-five (65) or older, eighteen years or younger, pregnant, and/or had pre-existing health conditions such as diabetes, heart disease, lung disease, blood disease, chronic obstructive pulmonary disease, asthma, bronchitis, emphysema, anemia, autoimmune disease.

137.    Excluded from the Class are assigned judges and members of their families within the first degree of consanguinity, Defendants, and any of their subsidiaries, affiliates, officers, and directors. Also excluded are Defendants' legal representatives, assignees, and successors.

138.    The Class Action meets the statutory requirements for the maintenance of a Class Action as set forth in HRCP 23, in that:

> a.    The persons who comprise the Class are so numerous that the joinder of all persons is impracticable and the disposition of their claims as a class will benefit the parties and the Court. While Plaintiffs are informed and believe that there are thousands of persons who were exposed to Air Pollutants from the Lahaina Fire, who would be members of the Class, the precise number of Class Members are unknown to Plaintiffs but may be ascertained from

objective evidence which Defendants possess.

b.    There is well-defined community of interest in that nearly all factual, legal, statutory, declaratory, and injunctive relief issues that are raised in this Complaint are common to the Class and will uniformly apply to every Class Member.

c.    The claims of Plaintiffs are typical of the claims of all Class Members, as all Class Members were and are similarly or identically harmed and their claims arise from the same actions and/or inactions of Defendants. Plaintiffs and all Class Members were exposed to Air Pollutants from the Lahaina Fire and as a result, each reasonably requires present and future medical monitoring to ensure early detection of any cancers, diseases, conditions, and/or illnesses cases by exposure to Air Pollutants.

d.    Plaintiffs, as the representatives of the Class, will fairly and adequately represent and protect the interests of the Class and has retained counsel who are competent and experienced in complex and class action litigation. There are no material conflicts between the claims of the representative Plaintiffs and Class Members that would make class certification inappropriate. Counsel for Plaintiffs will vigorously assert the claims of all Class Members and have the financial resources to do so.

e.    A class action is the superior method for the fair and efficient adjudication of this litigation because class treatment will obviate the need for unduly and unnecessary duplicative litigation that is likely to result in the absence of certification of this action.

139.    In addition to meeting the statutory prerequisites of a Class Action, this cause of action is properly maintained as a Class Action pursuant to HRCP 23, in that:

a.    Without class certification and determination of declaratory, injunctive, statutory, and other legal questions within the class format, prosecution of

separate actions by individual Class Members will create the risk of:

    i.    Inconsistent or varying adjudications with respect to individual Class Members which would establish incompatible standards of conduct for the parties opposing the Class; and/or

    ii.    Adjudication with respect to individual Class Members, which would, as a practical matter, be dispositive of interests of the other members that are not parties to the adjudication or substantially impair or impede their ability to protect their interests.

b.    Numerous questions of fact and law common to Plaintiffs and Class Members exist and predominate over any question affecting only individual Class Members. These include the following:

    i.    Whether Defendants owed a duty to design, construct, inspect, repair, and maintain their power poles, powerlines, transformers, reclosers, and other electrical equipment adequately;

    ii.    Whether Defendants owed a duty to maintain, operate, and inspect their powerlines, overhead electrical infrastructure, and equipment properly to ensure they would not cause a fire;

    iii.    Whether Defendants owed a duty to de-energize their powerlines during a Red Flag Warning to prevent fires;

    iv.    Whether Defendants owed a duty to de-energize their powerlines during a High Wind Watch to prevent fires;

    v.    Whether Defendants owed a duty to de-energize their powerlines during a high fire danger warning;

    vi.    Whether Defendants owed a duty to conduct adequate

vegetation management, such as clearing vegetation, trees, and limbs that would come into contact with powerlines and electrical equipment;

vii.     Whether Defendants owed a duty to de-energize their powerlines after Defendants had knowledge that some powerlines had collapsed, fallen, or otherwise came into contact with vegetation, structures, and/or objects;

viii.    Whether Defendants owed a duty to de-energize their powerlines after Defendants electrical infrastructure had ignited fires;

ix.      Whether Defendants owed a duty to implement reasonable policies, procedures, and equipment that would avoid igniting or spreading fire;

x.       Whether Defendants owed a duty to adjust their operations despite warnings about fire weather that could result in downed powerlines and cause rapid and dangerous fire growth and spread on or after August 8, 2023; and to prevent the downing of powerlines, which blocked evacuation routes during the Lahaina Fire;

xi.      Whether the power line infrastructure Defendants owned and operate, controlled, and/or managed caused or contributed to the Lahaina Fire on August 8, 2023;

xii.     Whether Defendants were negligent in their construction, maintenance, inspection, and operation of overhead electrical infrastructure;

xiii.    Whether Defendants were negligent in failing to use reasonable care in maintaining powerlines, including

thinning, and removing fuels in and around powerlines;

xiv. Whether Defendants' decision to not de-energize their powerlines before or during the Lahaina Fire was negligent;

xv. Whether Defendants' decision to not de-energize their powerlines before or during the Lahaina Fire was grossly negligent;

xvi. Whether Defendants' action and/or inactions give rise to gross negligence and/or was in reckless disregard for the safety of Plaintiffs and Class Members;

xvii. Whether Defendants considered the elevated risk of fire in West Maui on or around August 8, 2023, in deciding not to de-energize their powerlines;

xviii. Whether Plaintiffs and Class Members have been exposed to increased risk of injury as a result of the Lahaina Fire;

xix. Whether Plaintiffs and Class Members have been exposed to a significantly increased risk of injury as a result of the Lahaina Fire;

xx. Whether Plaintiffs and all Class Members are entitled to injunctive medical monitoring relief they seek herein;

xxi. Whether Defendants have any affirmative defenses that can be litigated on a class-wide basis; and/or

xxii. Whether a Court-supervised notice and diagnostic program(s) should be established to mitigate or reduce the risk of injury as a result of the effects of exposure to Air Pollutants emitted from the Lahaina Fire.

## COUNT I
## NEGLIGENCE
### (Against All Defendants)

140.    All preceding paragraphs are incorporated into this claim for relief as if set forth herein.

141.    Electricity is a dangerous instrumentality that poses an inherent risk to people and property. The provision of electrical services involves a peculiar and inherent risk of wildfire and requires the exercise of increased care and precaution commensurate with and proportionate to that increased risk, so as to make the transport of electricity through a utility infrastructure safe under all circumstances and exigencies.

142.    Defendants have special knowledge and expertise far beyond that of a layperson about the safe design, construction, operation, maintenance, and repair of their utility infrastructure. The provision of electrical services involves a peculiar and inherent danger and risk of wildfires.

143.    Before and on August 8, 2023, Defendants had a non-delegable duty to apply a level of care commensurate with, and proportionate to, the inherent dangers in designing, constructing, operating, maintaining, monitoring, and repairing their utility infrastructure. This duty also required Defendants to maintain appropriate vegetation management programs for the control of vegetation surrounding Defendants' exposed powerlines. This duty also required Defendants to consider the changing conditions of Defendants' electric utility infrastructure, as well as changing geographic, weather, and ecological conditions. This duty also required Defendants to take special precautions to protect nearby properties from wildfires caused by Defendants' electric utility infrastructures.

144.    Additional regulations applicable to Defendants included, without limitation, the requirement that Defendants trim or remove vegetation to maintain clearances from electric supply conductors. Moreover, Defendants needed to have a vegetation management program and keep appropriate records to ensure that timely trimming is accomplished to keep the designated minimum clearances.

38

145.    Defendants each breached their duties by, among other things:

    a.    Failing to operate, maintain, and repair their electric utility infrastructure so that the systems would withstand the foreseeable risk of fires;

    b.    Failing to prevent powerlines from improperly sagging or making contact with metal or other powerlines;

    c.    Failing to properly inspect and maintain vegetation in proximity to their energized powerlines to mitigate the foreseeable risk of fire;

    d.    Failing to conduct reasonably prompt, proper, and frequent inspections of their electric utility infrastructure;

    e.    Failing to promptly de-energize their electric utility infrastructure during fire-prone conditions;

    f.    Failing to promptly de-energize their electric utility infrastructure after vegetation fell on their powerlines;

    g.    Failing to promptly inspect their powerlines after vegetation fell on them;

    h.    Failing to properly train and supervise employees and agents responsible for maintenance and inspection of their electric utility infrastructure; and/or

    i.    Failing to implement and follow regulations and reasonably prudent practices to avoid fire ignition;

    j.    Failing to respond to resident complaints regarding its infrastructure; and/or

    k.    Failing to adequately respond to notices from its own system monitoring system of issues with its powerlines.

146.    Defendants knew of the extreme fire danger that the conditions immediately before August 8, 2023, created, and they breached their duties of reasonable care to Plaintiffs by failing to act reasonably despite that knowledge. The Lahaina Fire was a direct, legal, and proximate result of Defendants' breach of their duties of reasonable care to Plaintiffs.

147.    Through their conduct described herein, Defendants violated rules and regulations applicable to them. Among other things, Defendants failed to deploy employees to survey their

powerlines and ensure that none had been damaged or downed; failed to cut power to their lines once the fire started; and knowingly permitted the creation of circumstances where high winds were more likely to bring vegetation into contact with powerlines, where downed powerlines were more likely to have been damaged by falling vegetation or to have made contact with flammable vegetation, and where the reenergization of those lines without prior and proper inspection would create an extreme risk of a resulting wildfire.

148.    The statutes and regulations that Defendants violated are intended to prevent the exact type of harm that Plaintiffs suffered because of Defendants' failure to comply with the statutes and regulations. Defendants' failure to comply with the statutes and regulations directly, legally, and proximately resulted in the Lahaina Fire, and was a substantial factor in causing Plaintiffs to suffer foreseeable harm to their persons, interests, and property.

149.    Defendants acted with a conscious indifference to the probable and foreseeable consequences of their acts and omissions. In particular, following the devasting 2018 Camp Fire in California, Defendants publicly acknowledged that deenergizing powerlines in windy conditions was necessary to prevent devasting wildfires. Despite this knowledge, and despite their knowledge that Maui would be beset by windy conditions on or immediately before August 8, 2023, Defendants chose not to de-energize their powerlines. Defendant's conscious indifference to the risk of wildfire on August 8, manifesting as, among other things, a decision not to de-energize their lines, amounts to arson under Hawai'i Revised Statute section 708-8254. Defendant's conscious indifference to the risk of wildfire on August 8, manifesting as, among other things, a decision not to de-energize their lines, was a substantial factor in causing the Lahaina Fire and Plaintiffs' resulting damages therefrom.

150.    As a direct and legal result of Defendants' actions and/or omissions that caused the Lahaina Fire, Plaintiffs and Class Members were exposed to significant levels of Air Pollutants. These toxic Air Pollutants have been proven to cause illnesses, conditions, diseases and/or cancers in humans.

151.    As a further direct and legal result of Defendants' actions and/or omissions,

Plaintiffs and Class Members have suffered, and continue to suffer a significantly increased risk of developing a variety of illnesses and conditions relating to exposure to such Air Pollutants, including but not limited to, respiratory infections, asthma, COPD, reduced lung function, bronchitis, exacerbation of asthma, eye and respiratory tract irritation, heart disease, heart failure, all-cause mortality, premature death, respiratory morbidity, birth defects, and cancers.

152. Diagnostic and/or monitoring procedures exist that comport with contemporary scientific principles and the standard of care and make early detection of illnesses and conditions related to exposure to Air Pollutants possible and beneficial.

153. Plaintiffs therefore seek an injunction creating a Court-supervised, Defendant-funded medical monitoring regime for Plaintiffs and Class Members, which will facilitate the early diagnoses and adequate treatment in the event a Lahaina Fire related injury is diagnosed.

154. The proposed Court-supervised diagnostic and/or monitoring program includes, but is not limited to, anatomical baseline exams and diagnostic exams. This program is necessary and includes more monitoring than will be typically provided to Plaintiffs and Class Members to detect, prevent, and mitigate injury that may occur if the treatment is delayed, and enable prompt treatment of the adverse consequences of the Lahaina Fire.

155. As a result of being exposed to significant levels of Air Pollutants, the need for Plaintiffs' and Class Members' future monitoring is reasonably certain, and the monitoring is reasonable.

156. By monitoring and testing Plaintiffs and Class Members who are at increased risk of injury from the Lahaina Fire, the risk of Plaintiffs and Class Members suffering injury and disease would be significantly reduced, as the physicians of Plaintiffs and Class Members will have gained the information necessary to choose appropriate interventions and treatments.

157. A Court-supervised monitoring procedure is reasonably necessary according to contemporary scientific principles to enable Plaintiffs and Class Members to obtain early detection and diagnosis of the potential injury and increased risk of injury as a result of the Lahaina Fire.

158. Accordingly, Defendants should be required to establish a Court-supervised and

Court-administered trust fund, in an amount to be determined, to pay for the medical monitoring for protocol for all Class Members, which includes, among other things: (1) a notice campaign to all Class Members informing them of the availability and necessity of the medical monitoring protocol (2) a baseline and diagnostic exam related to, including, but not limited to, smoke inhalation problems and/or carcinogenic and/or other toxic effects.

159.    Defendants' negligent conduct has caused significant increased risk that the law recognizes as an injury to legally protected rights, giving rise to claims for injunctive/equitable relief. The distribution of damages to individual Class Members without programmatic relief as described above is inadequate, inefficient, and/or inferior to a judicial injunctive, declaratory, or equitable degree, establishing and supervising class-wide medical monitoring services as described and sought herein. Plaintiffs and Class Members have no adequate remedy at law, in that monetary damages cannot compensate them for the increased risks of disease or illness in relation to the Lahaina Fire.

160.    Without a Court-supervised comprehensive medical monitoring fund as described herein, Plaintiffs and Class Members will continue to endure increased risks of injury without proper diagnosis and opportunity for rehabilitation.

161.    As set forth above, Defendants' conduct was intentional, malicious, and in complete disregard to the rights of Plaintiffs and the Class, subjecting Defendants to awards of punitive damages.

**Count II**
**GROSS NEGLIGENCE**
**(Against All Defendants)**

162.    All preceding paragraphs are incorporated into this claim for relief as if set forth herein.

163.    Defendants knew of the extreme fire danger that the high winds posed to their overhead electrical infrastructure, particularly during Red Flag conditions. These risks included winds that couple topple over power poles and powerlines, causing them to fall to the ground,

ignite vegetation, and cause a wildfire that would spread rapidly.

164.    Despite having knowledge of the extreme risks of wildfires, Defendants chose not to de-energize their powerlines during the High Wind Watch and Red Flag Warning conditions for Maui prior to the Lahaina Fire.

165.    Furthermore, Defendants chose to not de-energize their powerlines even after they had knowledge that some poles and lines had fallen and were in vegetation or the ground.

166.    Defendants further failed to de-energize their lines, during and after the Lahaina Fire.

167.    Accordingly, Defendants acted with indifference to the probable consequences of their acts and omissions.

168.    Despite having knowledge of the risks of high winds and wildfires generally, a High Wind Watch, a Red Flag Warning, notices from its own monitoring system that its powerlines were experiencing issues in the days leading up to the Lahaina Fire, and specific warnings that high winds could blow down power poles and that fires would spread rapidly if ignited, Defendants did nothing.

169.    Defendants' gross negligence proximately caused the injuries that Plaintiffs and the Class suffered.

170.    Plaintiffs also each seek damages to be determined, on an individual basis, according to proof at trial, including, but not limited to personal injuries and medical monitoring caused by exposure to Air Pollutants.

171.    In addition, Plaintiffs are entitled to punitive damages for Defendants reckless, wanton, and conscious indifference to their health, safety, life, property, and constitutional rights to a clean and healthy environment in causing the Lahaina Fire.

**PRAYER FOR RELIEF**

Plaintiffs seek:

(a)    For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

(b)      For an order granting an injunction for the requested medical monitoring relief to provide Plaintiffs and Class Members with periodic medical examinations and such other medical procedures as are reasonably necessary and designed to facilitate early detection and treatment of conditions related to the Lahaina Fire. In addition, for the establishment of a Court-supervised medical monitoring program/fund to gather and forward to treating physicians of Plaintiffs and the Class Members information relating to the prevention, detection, and treatment of conditions related to the exposure to the Lahaina Fire;

(c)      Punitive damages on all causes of action where such damages are permissible by law in an amount to be proven at trial;

(d)      Attorneys' fees, expert fees, consultant fees, and litigation costs and expenses, to the extent permitted, and/or pursuant to the Court's inherent and equitable power to award attorney fees;

(e)      Pre-judgment interest to the extent permitted under HRS 636-16; and

(f)      Other relief as the Court shall deem proper, all according to proof.

## <u>JURY TRIAL REQUEST</u>

Plaintiffs request a jury trial on all causes of action for which a jury trial is available under the law.


Dated: August 22, 2023               Respectfully submitted,

                                      /s/ *Paul Starita*
                                      Paul Starita
                                      SINGLETON SCHREIBER LLP
                                      Wells Street Professional Center
                                      2145 Wells Street, Unit 302
                                      Wailuku, HI 96798
                                      Telephone: (808) 707-7117

                                      591 Camino de la Reina, Suite 1025
                                      San Diego, CA 92108
                                      (619) 771-3473